NOT FOR PUBLICATION                                                                                                    CLOSED

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

_____
                                       :
MARY SWINGLE,                          :
                                       :
                                       :
                                       :   CIVIL ACTION NO. 08-1186 (JAP)
                                       :
            Plaintiff,                 :
      v.                               :   OPINION
                                       :
NOVO NORDISK, INC. a Corporation,      :
ELIZABETH HILLIER, KENNETH             :
HOLICK, LYNN M. BAER and               :
JUDITH ANDRUS                          :
                                       :
            Defendants.                :
_____:

PISANO, District Judge.

Before the Court is Novo Nordisk, Elizabeth Hillier, Kenneth Holick, Lynn Baer and Judith Andrus' (collectively "Defendants"), Motion for Summary Judgment. For the reasons set forth herein, the Court grants summary judgment in favor of Defendants.

I.    BACKGROUND

      A.    Factual History

Plaintiff, Mary Swingle, (hereinafter "Plaintiff") was employed as a Project Manager ("PM") at Novo Nordisk ("Novo") from May 2004 until working conditions forced her to resign on September 11, 2007. (Certification of Thomas Linthorst, Exh. A, Pl.'s Dep. 19:15-20 (hereinafter "Pl.'s Dep.").) As a PM, she was responsible for overseeing clinical trials designed

to test the safety and efficacy of potential new drugs. (*Id.* 20:10-21:24.) Specifically, her duties included commencing clinical trials, managing them throughout, and ensuring that the projects were finished by a particular date. (*Id.* 21:22-22:8.)[1] Although she did not have direct management authority, she was responsible for setting her teams' guidelines and ensuring that each team member handled their own job responsibilities. (*Id.* 24:5-25:13.)

In 2005 Plaintiff began reporting to Defendant Elizabeth Hillier ("Hillier") after Hillier was promoted to Senior PM. (Pl.'s Rule 56.1 Stmt. at ¶ 22.) Hillier and Plaintiff had regular one-on-one meetings to discuss topics such as project-specific issues, Plaintiff's job performance and any general issues that Plaintiff had at the workplace. (*Id.* at ¶ 24.) At one point Hillier advised Plaintiff that she needed to improve her leadership skills and recommended that Plaintiff take a leadership training course. (*Id.* at ¶ 25.)

Around May 2006, Plaintiff was assigned as the PM for a clinical trial known as 1683 which had a sister project known as 1540. (*Id.* at ¶ 27, 30.) Mardi Mazzeo ("Mazzeo") was the Senior PM and had overall responsibility for the trial. (*Id.* at ¶ 31.) The trial proved to be complicated and Mazzeo expressed her concerns to Plaintiff. (Pl.'s Dep. 78:11-15.) On September 15, 2006, Plaintiff had a meeting with Hillier to discuss the issues associated with the project. (Pl.'s Dep. Exh. D-7.) Specifically, Hillier informed Plaintiff that she was aware that the team dynamics on 1683/1540 were strained. (*Id.*) Hillier discussed an incident where she overheard Plaintiff and Mazzeo having a discussion with raised voices and informed Plaintiff that this behavior was not acceptable. (*Id.*; Pl.'s Dep. 82:18-84:2.) Hillier was also concerned

---

[1]A clinical trial at Novo begins with "site" recruitment. (Pl.'s Rule 56.1 Stmt. ¶ 9.) Sites are third-party doctors who treat patients with the potential drug to gather data on the drug. (*Id.*) Once the sites are recruited, the study begins with the "first patient/first visit." (*Id.* at ¶ 14.)

that certain members of the 1683/1540 team were not included in a particular meeting, that project materials were not in the appropriate condition and that Plaintiff had overstepped her authority by delegating extra tasks to another team member. (Pl.'s Dep. Exh. D-7; Pl.'s Dep. 79:18-82:17.) Similar issues were also addressed with other employees on the project including Lisa Schwartz ("Schwartz"). (Pl.'s Rule 56.1 Stmt. ¶ 37; Bozeman Cert., Exh. C, Schwartz Dep. 99:12-22; 104:6-9.)

In 2004, prior to her employment at Novo, Plaintiff had one of her kidneys removed. (*Id.* ¶ 62.) It was also discovered that Plaintiff had a tumor on her remaining kidney and this condition required her to submit to medical testing once or twice a year. (*Id.*) Plaintiff admits that during the course of her employment, Novo always afforded her the time to undergo testing. (*Id.* at ¶ 63.) Eventually, it became necessary for Plaintiff to have surgery on her kidney and informed Hillier on October 9, 2006. (*Id.* at ¶ 64.) Hillier was concerned for Plaintiff's health and approved her request for time off beginning on October 20, 2006. (*Id.* at ¶ 65-66.) Hillier assured Plaintiff that she would find someone else to cover 1683/1540 in Plaintiff's absence. (*Id.* at 65.) Plaintiff admits that Defendants never asked her to delay her surgery or her medical leave and did not bother her with work during her leave. (*Id.* at ¶ 68.)

Plaintiff returned from medical leave on January 22, 2007 and immediately returned to her position as PM. (*Id.* at ¶ 71.) Upon her return, Plaintiff was reassigned to a clinical trial for a product called VAG 2195. (*Id.* at ¶ 72, 74.) On February 19, 2007, Plaintiff met with Hillier for her 2006 annual performance review. (*Id.* at ¶ 76.) Plaintiff received a rating of "meets expectations" as well as a salary increase to $103,300 and a full bonus of $17,400, the largest

bonus Plaintiff ever received at Novo.[2] (*Id.* at ¶ 79, 80.)  Hillier, did however, offer Plaintiff some constructive feedback regarding her performance on the 1683/1540 trial prior to her medical leave. (*Id.* at ¶ 84.)  Specifically, Hillier stated that:

> There was an observable risk to the programs seen during the start-up of 1683 (Mary's primary study) and in 1540 (where Mary needed to mentor a relatively new project manager) when the projects were assumed by the new Project Manager.  Some findings are the following; site selection status was half the number it needed to be.  The tracking sheets and metrics were not organized and information had multiple errors.  Investigator meeting invitations/notifications were not sent early.  Standard is 3 months prior, minimum 2 months prior to the event.  Your invites were sent 6 weeks this led to lack of full site representation at the meeting.  Vendor contracts were not being review[ed] and completed timely.  Study paperwork, i.e.; contracts and 1572s had incorrect math calculations and the 1572 had the wrong IND # and the wrong lab zipcode.  These errors had an impact on extra workload to the resources and extra money spent on the project.  These study start and team facilitation activities were not executed as expected.

(*Id.*)

Hillier advised Plaintiff that she would be placed on a ninety-day Performance Improvement Plan ("PIP") aimed at helping Plaintiff address these performance deficiencies. (*Id.* at ¶ 86.)  On March 21, 2007, approximately one month after receiving her review, Plaintiff applied for an internal Regional Clinical Research Associate ("CRA") at Novo, a job that paid less than the PM position and required different skills. (*Id.* at ¶ 86, 91.)  Plaintiff testified that she applied for the job because of the "problems that [Hillier] and I were having that I would feel more comfortable working somewhere else because I wanted to stay within Novo, and since I qualified for the job." (Pl.'s Dep. 161:11-16.)  Eventually, a contractor who was already performing a CRA role for Novo was hired. (Pl.'s Rule 56.1 Stmt. ¶ 89.)

On March 30, 2007, Plaintiff met with Hillier and Judy Andrus ("Andrus"), a Human

---

[2]Although Plaintiff had been on medical leave for about 20% of the year, Novo did not pro rate her bonus and Plaintiff received the full target amount. (*Id.* at ¶ 81.)

Resources Representative, to review Plaintiff's PIP. (*Id.* at ¶ 93.) In addition to the PIP, Hillier and Andrus gave Plaintiff a copy of a written warning along with Novo's Disciplinary/Termination Policy. (*Id.*) The termination policy warned that "if immediate improvement is not achieved and sustained, further disciplinary action will occur, up to and including termination." (*Id.*)

Plaintiff thereafter consulted with an attorney Ralph Powell, her counsel of record in this matter, who advised her to submit a written rebuttal to her performance warning. (*Id.* at ¶ 97, 101.) In a letter dated April 3, 2006, she responded, to what she considered, the false accusations Hillier had made in her 2006 performance review. (*Id.* at ¶ 101.) On April 23, 2007, Hillier and Andrus met with Plaintiff to discuss her letter. (*Id.* at 102.) Hillier recommended rescinding the written warning letter in lieu of a verbal warning. (Bozeman Cert., Exh. B, Hillier Dep. 126:19-128:5; Pl.'s Rule 56.1 Stmt. ¶ 104.) Plaintiff wrote a letter, dated May 14, 2007, rebutting the verbal warning. (Pl.'s Rule 56.1 Stmt. ¶ 105.)

Plaintiff claims that she received negative performance reviews and was treated poorly because of her condition that required medical leave. For instance, she alleges that since she took medical leave she was forced to cancel a training session that she had previously registered for due to budget cutbacks. (*Id.* ¶ 107, 110.) However, Plaintiff testified that another co-worker also had to cancel the training course, that the budget cutback affected others in the department and that she did not feel as though the budget cutback and cancellation was directed toward her. (Pl.'s Dep. 206:8-207:9.) Plaintiff also claims that she was assigned "extra work by constant e-mails requesting different updates, different – different things that I needed to do." (*Id.* 186:17-22.) Furthermore, Plaintiff admits that no one at Novo ever made disparaging remarks about her

medical condition or her medical leave except for a comment by Lynn Baer, Executive Director of Plaintiff's department, ("Baer") who allegedly asked Plaintiff when she was taking medical leave using a negative tone.[3]  (*Id.* 186:17-22.)

On July 19, 2007, Plaintiff received a written warning from Hillier and Andrus stating that Plaintiff's performance had not improved.  (Pl.'s Dep. 219:9-11.)  Once again, Plaintiff responded to the written warning with a rebuttal letter dated August 1, 2007.  (Pl.'s Rule 56.1 Stmt. ¶ 118.)  Shortly thereafter, on August 31, 2007, Plaintiff received a job offer from Bristol-Myers Squibb ("BMS") which paid her a base salary of $110,000 per year along with full benefits and the possibility of an annual bonus.  (*Id.* at ¶ 119-121.)  Plaintiff testified that she began considering other employment options as early as May 20, 2007 because of the manner in which she was being treated at Novo.  (Pl.'s Dep. 312:1-11.)   Plaintiff admitted, however, that she would not have resigned but for the BMS offer because she was the main provider in her household.  (Pl.'s Dep. 307:7-13.)

**B.  Procedural History**

On March 7, 2008 Plaintiff filed a six-count Complaint against Defendants.  In her Complaint she asserts that Defendants: (1) retaliated against her in violation of the Family Medical Leave Act ("FMLA"); (2) discriminated against her in violation of the New Jersey Law Against Discrimination ("NJLAD"); (3) harassed her in violation of NJLAD; and (4) aided and abetted in violation of NJLAD.[4]  Plaintiff also asserts one claim of intentional infliction of

---

[3]Although Baer provided input to Hillier regarding Plaintiff's warnings, it was ultimately Hillier's decision to issue the written warnings.  (Hillier Dep. 123:23-124:16.)

[4]Plaintiff admits that Defendant Kenneth Holick ("Holick") had no role in Plaintiff's employment evaluations because he was not employed by Novo at the time.  (Pl.'s Rule 56.1

emotional distress and one claim of negligent infliction of emotional distress. Defendants filed the instant Summary Judgment Motion on June 12, 2009. Plaintiff opposes this Motion.

## II.     DISCUSSION

### A.     Standard of Review

A court shall grant summary judgment under Federal Rule of Civil Procedure 56(c) "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The substantive law identifies which facts are critical or "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

In a summary judgment motion, the moving party must show, first, that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The burden then shifts to the non-moving party to present evidence that a genuine fact issue compels a trial. *Id.* at 324. In so presenting, the non-moving party must offer specific facts that establish a genuine issue of material fact, not just "some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986).

The Court must consider all facts and their logical inferences in the light most favorable to the non-moving party. *Pollock v. Am. Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir. 1986). The Court shall not "weigh the evidence and determine the truth of the matter," but need

---

Stmt. ¶ 138.) She argues that since Holick was Hillier's Supervisor, he knew that Plaintiff believed she was being falsely accused of poor job performance and was being mistreated by Hillier for taking medical leave, yet refused to take any action. (*Id.* at 139.) Similarly, Plaintiff argues that Andrus knew about her mistreatment and refused to take any action. Additionally, Plaintiff maintains that she contacted Andrus for help regarding the CRA position and was told that there were no positions at Novo for Plaintiff. (*Id.* at 142.)

determine only whether a genuine issue necessitates a trial. *Anderson*, 477 U.S. at 249. If the non-moving party fails to demonstrate proof beyond a "mere scintilla" of evidence that a genuine issue of material fact exists, then the Court must grant summary judgment. *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1363 (3d Cir. 1992), *cert. denied*, 507 U.S. 912 (1993).

    **B.**    **Legal Analysis**

    *1.*    *FMLA Retaliation Claim*

The FMLA was enacted to provide medical and personal leave, in excess of what is already provided by an employer, to employees who need to take time off to care for either themselves or family members. The act prohibits discrimination based on an employee's decision to avail herself of the benefits of the FMLA leave. *Parker v. Hahnemann Hosp.*, 234 F. Supp. 2d 478, 488 (D.N.J. 2002). Courts generally apply the burden shifting *McDonnell Douglas* framework to claims of retaliation under the FMLA. *Id.*; *Gventer v. Theraphysics Partners of Western Pa., Inc.*, 41 Fed. Appx. 552, 553 (3d Cir. 2002). As such, to set forth a *prima facie* retaliation claim a plaintiff must demonstrate that: "(1) she availed herself of a protected right under the FMLA; (2) she was adversely affected by an employment decision; and (3) there is a causal link between the employee's protected activity and the employer's adverse employment action." *Parker*, 234 F. Supp. 2d at 488. By establishing a *prima facie* case, a plaintiff creates a rebuttable presumption of discrimination which the employer then has the opportunity to refute by articulating a legitimate, nondiscriminatory reason for the adverse employment decision. *Id.* If the employer is successful, the burden then shifts back to the plaintiff to prove that the employer's stated reason was merely a pretext for retaliating against her in violation fo the FMLA. *Id.* at 489.

In the instant case, there is no dispute that Plaintiff took leave under the FMLA. The main issue is whether or not she was subjected to an adverse employment action. Defendants argue that Plaintiff cannot satisfy this prong because she resigned to take a higher paying job with a competitor. (Defs.' Br. p. 21.) On the other hand, Plaintiff argues that she was constructively discharged because of the manner in which she was treated by Defendants when she returned from her FMLA leave. (Pl.'s Opp. Br. p. 17.) Additionally, she claims that being placed on a performance improvement plan constitutes an adverse employment action. (*Id.* at 16.)

The Third Circuit employs an objective test to evaluate constructive discharge claims. *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1079 (3d Cir. 1992). This test requires a court to consider: "whether 'the conduct complained of would have the foreseeable result that working conditions would be so unpleasant or difficult that a reasonable person in the employee's shoes would resign.'" *Id.* (citing *Goss v. Exxon Office Sys. Co.*, 747 F.2d 885, 887-88 (3d Cir. 1984) (finding constructive discharge because plaintiff was reassigned to a less lucrative territory because of her sex)). The constructive discharge standard envisions working conditions that are "outrageous, coercive and unconscionable" and requires conduct more egregious than necessary to satisfy a hostile work environment claim. *Shepherd v. Hunterdon Developmental Ctr.*, 174 N.J. 1, 28 (2002).

Here, Plaintiff claims that she was constructively discharged because she was allegedly falsely accused of poor job performance and she was singled out by her supervisors due to her FMLA leave of absence. (Pl.'s Br. pp. 19-20.) Both parties cite to *Clowes v. Allegheny Valley Hospital*, 991 F.2d 1159 (3d Cir. 1993) where the Third Circuit reversed a jury finding that the plaintiff was constructively discharged under the ADEA. The court analyzed several factors

commonly cited by employees in constructive discharge cases including whether: (1) the employee was threatened with termination; (2) the employer suggested that the employee retire or resign; (3) the employee was demoted or had her pay reduced; (4) the employee was involuntarily transferred to a less desirable position; and (5) the employee's job responsibilities were altered. *Clowes*, 991 F.2d at 1161. In evaluating these factors, the court found it significant that the employee never requested to be transferred to another position and did not alert her supervisor that she felt forced to resign. *Id.* Additionally, the court stated that it was highly significant that the plaintiff's principle complaint was the overzealous supervision of her work by her supervisor. *Id.* at 1162. The court noted that although overzealous supervision could amount to constructive discharge, it "must be critically examined so that the ADEA is not improperly used as a means of thwarting an employer's nondiscriminatory efforts to insist on high standards." *Id.* at 1162.

In the instant case, the Court finds that a reasonable person in Plaintiff's shoes would not feel compelled to resign. Specifically, the Court finds it noteworthy that after Plaintiff returned from her FMLA medical leave, she was rated as "meets expectations" in her performance evaluation, given a raise, and awarded her full bonus. The undisputed facts indicate that she was never demoted or involuntarily transferred and although she was given performance warnings, she was given the opportunity to improve. Additionally, although Plaintiff claims that she was forced to cancel a training session, the facts state that she was not singled out as another employee also cancelled the training session due to budget cutbacks. Although Plaintiff did apply for another position at Novo and was subsequently rejected in favor of another person with more relevant experience, the Court finds this to be insignificant in light of the other facts of the

case. Finally, the Court notes that although Plaintiff was upset about the stricter supervision of her work and the assignment of additional tasks, "the law does not permit an employee's subjective perceptions to govern a claim of constructive discharge." *Id.* Moreover, there is nothing outrageous, coercive or unconscionable about an employer requesting status updates from an employee or assigning her a few additional tasks. Finally, the Court finds that Plaintiff's performance improvement plan does not constitute adverse employment action for the purposes of the FMLA. *See Cole v. State of Illinois*, 562 F.3d 812 (7th Cir. 2009) (finding that a performance improvement plan does not constitute adverse action under the FMLA).[5]

Even if Plaintiff were constructively discharged, Plaintiff still cannot establish a prima facie case of FMLA retaliation because there is no causal connection between Plaintiff's protected activity and any adverse employment action. Plaintiff argues that she was unfairly disciplined for her work on the 1683/1540 project two days after she announced she was taking medical leave. (Pl.'s Br. p. 22.) However, Schwartz, another employee on the project who did not request medical leave, was similarly disciplined. Moreover, the fact that Plaintiff received a good performance evaluation, a raise and a bonus, after returning from FMLA leave militates against any retaliation.

Because Plaintiff cannot set forth a prima facie case, summary judgment on her retaliation

---

[5]Plaintiff cites to *Moore v. City of Philadelphia*, 461 F.3d 331, 342 (3d Cir. 2006), *Oliva v. State*, 589 F. Supp. 2d 539, 542 (D.N.J. 2008) and *Pavlik v. Potter*, 2008 U.S. Dist. LEXIS 87225 at *21-22 (D.N.J. Oct. 27, 2008) for the proposition that a negative employment evaluation rises to the level of adverse employment action. However, the Court finds these cases to be inapposite. In the cited cases, the courts determined that negative employment evaluations are adverse if they cause the plaintiffs to be dissuaded from filing a complaint charging unlawful discrimination. Here, the undisputed facts show that Plaintiff submitted several written rebuttals to her negative performance evaluations thus suggesting that she was not dissuaded from filing any sort of complaint.

claim is granted.

    2.    *NJLAD Discrimination Claim*

The NJLAD is designed to prevent employment discrimination based on an employee's disability. *Victor v. N.J.*, 401 N.J. Super. 596, 609 (App. Div. 2008). To prove a prima facie disability discrimination claim a plaintiff must satisfy the following elements: "(1) plaintiff was handicapped or disabled within the meaning of the statute; (2) plaintiff was qualified to perform the essential functions of the position of employment, with or without the accommodation; [and] (3) plaintiff suffered an adverse employment action because of the handicap or disability." *Id.* The burden then shifts to the defendant to articulate a legitimate, non-discriminatory reason for the employment action. *El-Sioufi v. St. Peter's Univ. Hosp.*, 382 N.J. Super. 145, 166 (App. Div. 2005). Finally, if the defendant is able to do so, the plaintiff has the opportunity to prove that the defendant's reason was a pretext for discrimination. *Id.*

For the same reasons expressed above in the analysis of the FMLA retaliation claim, the Court finds that Plaintiff has not suffered from an adverse employment action under NJLAD. As such, Plaintiff cannot establish a prima facie disability discrimination claim.

    3.    *NJLAD Harassment Claim*

To establish a hostile work environment claim a plaintiff must show: (1) that the complained of conduct would not have occurred but for his disability; (2) "that the conduct was severe or pervasive enough to (3) make a reasonable [disabled person] believe that the (4) conditions of employment are altered and the working environment is hostile or abusive." *Lehmann v. Toys 'R' Us, Inc.*, 132 N.J. 587, 604-05 (1993); *Buffa v. N.J. State Dep't of Judiciary*, 56 Fed. Appx. 571, 576 (3d Cir. 2003) (applying the *Lehmann* framework to a hostile

work environment claim based on disability). Some of the factors courts consider when analyzing the severity and pervasiveness of the defendant's conduct include: the degree and type of the obscenity, the frequency of the offensive encounters, and whether the offensive encounters interfered with the plaintiff's work performance. *Baliko v. Int'l Union of Operating Eng'rs*, 322 N.J. Super. 261, 276 (App. Div. 1999).

Here, Plaintiff argues that she was subjected to a hostile work environment because of her medical condition. (Pl.'s Br. p. 26.) However, as discussed above, Plaintiff cannot establish that the performance management that she was subjected to related to her medical condition or leave. Moreover, the conduct she complained of, including closer supervision and the assignment of more tasks, does not give rise to the type of severe and pervasive conduct contemplated by the NJLAD. Accordingly, summary judgment is granted on this claim.

   4. *Aiding and Abetting Claims Under NJLAD*

The *NJLAD* prohibits unlawful discrimination by an employer. The New Jersey Supreme Court has found that individual employees are not encompassed within the meaning of employer under *NJLAD*. *Tarr v. Ciasulli*, 181 N.J. 70, 83 (2004). However, an employee may be liable as an aider or abettor if the plaintiff is able to establish that: "(1) the party whom the defendant aids ... perform[s] a wrongful act that causes an injury; (2) the defendant [was] generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; [and] (3) the defendant ... knowingly and substantially assist[ed] the principal violation." *Id.* at 84 (quoting *Hurley v. Atlantic City Police Dep't*, 174 F.3d 95, 127 (3d Cir. 1999)). Courts routinely analyze the following five factors from the Restatement (Second) of Torts in evaluating whether an employee "substantially assisted" the principal violator: "(1) the nature of the act

encouraged; (2) the amount of assistance given by the supervisor; (3) whether the supervisor was present at the time of the asserted harassment; (4) the supervisor's relations to the others; and (5) the state of mind of the supervisor." *Tarr*, 181 N.J. at 84.

As a threshold issue, the Court finds that since Novo is not liable under NJLAD, the individual defendants cannot be held liable for aiding and abetting. However, even if Novo were liable, the conclusion on the aiding and abetting liability remains the same.

Plaintiff seeks to hold Baer liable for her question to Plaintiff regarding the timing of her medical leave and for criticizing her work performance. The Court finds that merely asking one question does not arise to substantial assistance. Similarly, Baer's criticism of Plaintiff's work performance does not suggest that she was motivated by any animus relating to Plaintiff's medical condition or leave.

Similarly, Holick and Andrus cannot be held individually liable. Holick had no role in Plaintiff's employment evaluations and was not even employed by Novo at the time. Plaintiff argues that as Hillier's supervisor, Holick should have known that Hillier was mistreating her because Plaintiff attempted to speak with him about Hillier. However, Plaintiff alleges no facts suggesting that Holick was motivated by bias because of her medical leave. Likewise, although Andrus had a role in Plaintiff's performance evaluation, Plaintiff has alleged no facts indicating that Andrus was similarly motivated.

Finally, Hillier cannot he held liable as an aider and abettor. Plaintiff seeks to hold Novo responsible based on Hillier's actions. Because the principal wrongdoer cannot be found liable for aiding and abetting her own conduct, there is no aiding and abetting liability for Hillier. *Newsome v. Admin. Office of Courts*, 103 F. Supp. 2d 807, 823 (D.N.J. 2003).

Accordingly, summary judgment is granted as to the aiding and abetting liability for the named individual Defendants.

   5.   *Intentional and Negligent Infliction of Emotional Distress Claims*

To set forth a cause of action for the tort of intentional infliction of emotional distress a plaintiff must prove that (1) the defendant acted intentionally or recklessly; (2) the defendant's conduct was outrageous; (3) the defendant's actions proximately caused plaintiff's emotional distress; and (4) plaintiff's emotional distress was "so severe that no reasonable man could be expected to endure it." *Buckley v. Trenton Sav. Fund Soc.*, 111 N.J. 355, 366 (1988) (citing Restatement (Second) of Torts § 46 cmt. d.)  The defendant's conduct must be "done with the intent to do the act and to produce the emotional distress, or in deliberate disregard of a high degree of probability that emotional distress will follow." *Buckley*, 111 N.J. at 366. Additionally, "the conduct must be 'so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.'" *Id.* (citing Restatement (Second) of Torts § 46 comment d.)  Courts have noted that it is "extremely rare to find conduct in the employment context which will rise to the level of outrageousness necessary to provide a basis for recovery." *Cox v. Keystone Carbon Co.*, 861 F.2d 390, 395 (3d Cir. 1988); *Fregara v. Jet Aviation Business Jets*, 764 F. Supp. 940, 956 (D.N.J. 1991).

The Court finds that Plaintiff's intentional infliction of emotional distress claim fails. The acts that Plaintiff complains of, continuing supervision of her work after receiving a performance warning, simply do not rise to the level of extreme or outrageous conduct contemplated by this tort.  Additionally, Plaintiff cannot maintain a claim for negligent infliction

of emotional distress because negligence claims against employers are barred by the Workers' Compensation Act.  *Ditzel v. Univ. of Med. & Dentistry*,  962 F. Supp. 595, 608 (D.N.J. 1997). Summary judgment is therefore granted on these claims.

### III.     CONCLUSION

For the reasons expressed above, the Court grants Defendants' motion for summary judgment.  An appropriate order accompanies this Opinion.

/s/ Joel A. Pisano
JOEL A. PISANO, U.S.D.J.

Dated: August 27th, 2009